U.S. Bank N.A. v EquiFirst Corp. (2023 NY Slip Op 51150(U))

[*1]

U.S. Bank N.A. v EquiFirst Corp.

2023 NY Slip Op 51150(U)

Decided on October 27, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 27, 2023
Supreme Court, New York County

U.S. Bank National Association, Solely in its Capacity as 
 Trustee of the Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007 - BC2, Plaintiff,

against
EquiFirst Corporation, Barclays Bank PLC, Defendant.

Index No. 650692/2013

For the Plaintiff(s):
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, New York 10017
BY: PRISHIKA RAJ, ESQ.
NEIL R. LIEBERMAN, ESQ.
For the Defendant(s):
SULLIVAN & CROMWELL LLP 
125 Broad Street 
New York, New York 10004 
BY: JEFF SCOTT, ESQ.

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 168, 169 were read on this motion to/for DISMISSAL.
In this residential mortgage-backed securities action, defendants EquiFirst Corporation ("EquiFirst") and Barclays Bank PLC ("Barclays") move, pursuant to CPLR 3211(a)(1) and 3211(a)(7), to dismiss the amended complaint filed by plaintiff trustee U.S. Bank National Association ("U.S. Bank"). Previously, this court dismissed claims for breach of representation and warranty ("R&W") as asserted against EquiFirst. At that time, the court did not address the issue of whether Barclays could be held liable for EquiFirst's actions as upon an alter ego theory of liability. Now, upon plaintiff's filing of its second amended complaint, defendants move to dismiss the sole remaining claim: for alleged breach of defendants' duty to notify plaintiffs of [*2]materially defective loans. EquiFirst primarily argues that plaintiff's failure to notify claim must be dismissed because it is time-barred. EquiFirst also argues that plaintiff's claim fails because EquiFirst's alleged failure to give notice did not proximately cause plaintiff's alleged damages. Finally, Barclays argues that, under North Carolina law, plaintiffs' alter ego allegations as asserted against Barclays fail because they are conclusory and insufficient as a matter of law. In this court's view, defendants' arguments related to EquiFirst's alleged liability are not persuasive. Accordingly, defendants' motion to dismiss is denied insofar it seeks dismissal of claims asserted against EquiFirst. However, this court agrees with Barclays that plaintiff has not sufficiently pleaded Barclays' alter-ego liability.
BACKGROUND
The following facts are taken from the amended complaint.
EquiFirst was an originator of residential mortgage loans (see NYSCEF Doc. No. 144 at 16). As part of its regular operations, EquiFirst sold pools of loans it had originated to, among others, Lehman Brothers Bank, FSB ("LBB"). On February 1, 2006, EquiFirst and LBB executed a Mortgage Loan Purchase Agreement (the "BC2-MLPA") pursuant to which EquiFirst agreed to sell to LBB, from time to time, loans that it had originated (id. at 19).
A year after EquiFirst and LBB executed the BC2-MLPA, Lehman Brothers Holdings Inc. ("LBHI") sponsored the SASC 2007-BC2 securitization (the "SASC Securitization") — a securitization herein at issue. Pursuant to a trust agreement that closed on February 28, 2007, LBB deposited into the SASC 2007-BC2 trust approximately $642 million of loans (id. at 25-26, 28). The trust then issued certificates that were sold to investors (id. at 28). U.S. Bank alleges that all rights, title, interest, and obligations under the MLPA relating to the EquiFirst loans were passed through to it under the various agreements (id. at 22). The SASC securitization closed on February 28, 2007.
EquiFirst made various representations in the BC2-MLPA relating to the loans it sold to LBB, including regarding its origination practices, the qualities of loans, and the creditworthiness of the individual loan holders (id. at 7). Moreover — and of particular importance to this case — the parties to the BC2-MLPA each agreed to "prompt[ly]" notify the other party if it discovered a material breach:
Upon discovery by either the Seller or the Purchaser of a breach of any of the foregoing [R&Ws] which materially and adversely affects the value of the Mortgage Loans . . . (in the case of any of the foregoing, a "Breach"), the party discovering such Breach shall give prompt written notice to the other. (BC2-MLPA § 8(a).)
Then, on September 18, 2008, LBHI filed for Chapter 11 bankruptcy. On September 21, 2009, U.S. Bank filed proofs of claim for the SASC 2007-BC2 securitization against both LBHI, as the securitization's seller, and SASC, as the securitization's depositor.
On February 28, 2013, the Federal Housing Finance Agency ("FHFA"), as conservator for Freddie Mac, initiated this suit against EquiFirst and Barclays by filing a summons with notice (see NYSCEF Doc. No. 1). U.S. Bank, specifically in its capacity as a trustee of the Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-BC2, later assumed the role of plaintiff and filed a complaint on October 28, 2013 (see NYSCEF Doc. No. 9). The complaint focused on loans that were securitized in the SASC 2007-BC2 and it alleged various breaches of representations and warranties in connection with those loans.
On January 6, 2014, defendants moved to dismiss the complaint. At the parties' request, oral argument on the motion was held in abeyance pending resolution of the then-pending appeal [*3]in ACE Securities Corp. v DB Structured Products, Inc. (see NYSCEF Doc. No. 46). After the Court of Appeals affirmed the First Department's ruling in ACE Securities, the parties stipulated that, because the court (Hon. Marcy Friedman, J.S.C., then-presiding) had addressed in prior opinions each of the issues dispositive of the defendants' motion to dismiss, oral argument was unnecessary (see NYSCEF Doc. No. 141). In the same stipulation, however, the parties recognized plaintiff's right to seek leave to replead a failure-to-notify claim ("FTN" claim). Then on July 19, 2016, this court granted defendants' motion to dismiss plaintiff's claims for R&W breaches as untimely, without prejudice to a motion by plaintiff for leave to replead an FTN claim (see NYSCEF Doc. No. 142 at 6).
On March 7, 2018, this court issued its bellwether decision on the timeliness and viability of FTN claims (see Fed. Hous. Fin. Agency for Fed. Home Loan Mortg. Corp. v. Morgan Stanley ABS Capital I Inc., 59 Misc 3d 754 (Sup Ct NY Cty. 2018) (Hon. Marcy Friedman, J.S.C.) (the "Bellwether decision"). Relying on First Department precedent holding that the duty to notify is an independently enforceable contractual obligation—separate from the repurchase obligations arising from the R&Ws themselves—Justice Friedman found that "a defendant does not breach its notification obligation until it discovers a breach of representations and warranties and fails to give prompt written notice to the Trustee" (id. at 772; see also Nomura Home Equity Loan Inc. Series 2006-FM2 v. Nomura Credit & Capital, Inc., 133 AD3d 96, 108 [1st Dep't 2015]). In so holding, Justice Friedman rejected arguments that the statute of limitations for FTN claims begins to run at the time the R&Ws are made (Bellwether decision at 769).
The court further explained that FTN claims "will be timely if based on breaches that the defendant discovered within the six-year period immediately preceding the assertion of the failure to notify causes of action" (id. at 777). Claims based on defendants' discovery of breaches prior to this six-year period "will not be timely" (id.). Moreover, this court held that the damages for the timely claims will be subject to limitations and that damages "equivalent to those under the repurchase remedy (repurchase damages) will not be available even for timely brought failure-to-notify claims, unless they are based on breaches discovered during the six-year period following the date of the closing, while the repurchase remedy remained available to the Trustee" (id.). In New York, six-year statute of limitations applies. Accordingly, only discoveries of breaches made after October 28, 2007 (six years before suit) and before February 28, 2013 (six years from closing of the relevant transaction) will give rise to claims for which plaintiff can recover full repurchase damages. With respect to breaches discovered after February 28, 2013, but within the six-year statutory period immediately preceding plaintiff's assertion of the FTN claim (meaning between February 29, 2013 and October 28, 2013), only nominal damages would be available (id.). Notably, the court did not resolve whether "discovery" is triggered by a defendant's actual knowledge or by inquiry notice of a breach, deciding that Article 31 disclosure would ultimately be needed to resolve this "critical issue" (id. at 776).
Following the court's Bellwether decision, plaintiff filed an amended complaint—including FTN claims—on January 22, 2019 (see NYSCEF Doc. No. 133). In the amended complaint, plaintiff alleges that defendants' contractual notification obligations spring from several agreements, including:
• The Amended and Restated Flow Mortgage Loan Purchase and Warranties Agreement, dated as of February 1, 2006 (the "SASC MLPA"), pursuant to which EquiFirst sold mortgage loans to Lehman Brothers Bank, as Purchaser, and made R&Ws concerning the [*4]quality of the mortgage loans, (amended complaint at 19-20);
• The Assignment and Assumption Agreement dated as of February 1, 2007 (the "SASC AAA"), pursuant to which Lehman Brothers Bank assigned all of its rights, title, and obligations under the SASC MLPA to Lehman Brothers Holding, Inc. ("LBHI") as Sponsor of the securitization, (id. at 21);
• The Mortgage Loan Sale and Assignment Agreement (the "SASC MLSAA"), pursuant to which LBHI assigned to the Depositor, Structured Asset Securities Corporation, its rights under the loans and MPLA, (id. at 22);
• The Trust Agreement dated as of February 1, 2007 (the "SASC Trust Agreement"), pursuant to which SASC transferred the Mortgage Loans to the Trust, (id. at 14, 23, 27, 31).
As noted earlier, under Section 8(a) of the SASC MLPA, EquiFirst promised to provide written notification if it discovered a material breach of its R&Ws regarding the loans, agreeing that "[u]pon discovery by either [EquiFirst] or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser . . . the party discovering such Breach shall give prompt written notice to the other" (id. at 75). As a result of the assignments contained in the relevant agreements, EquiFirst's duty to notify ran to and was enforceable by plaintiff as trustee (id. at 21—24, 27). Defendants do not contest this point.
According to plaintiff, Barclays succeeded EquiFirst's obligations as the result of its purchase of EquiFirst, a transaction allegedly already in progress when the securitization relevant for this action closed. According to the Prospectus Supplement for the securitization, Barclays announced on January 19, 2007 that it had entered into an agreement to purchase EquiFirst (id. at 93). The SASC securitization closed the following month on February 28, 2007, and Barclays completed its acquisition of EquiFirst by April of that year (id. at 94).
According to the amended complaint, Barclays subsequently combined EquiFirst with Barclays' own mortgage business to create a vertically integrated operation under Barclays' control, began firing EquiFirst personnel just four months after the acquisition, and within two years terminated EquiFirst's separate lending operations and closed EquiFirst's headquarters (id. 94—97). Ultimately, according to plaintiff, Barclays dissolved EquiFirst, transferring its remaining assets and employees for use in Barclays' own mortgage business, and leaving behind an allegedly moribund organization with insufficient capital to satisfy its liabilities, including for R&W breaches (id. at 98-100).
With respect to the FTN claims which are asserted against EquiFirst as the originator of the loans and against Barclays as either EquiFirst' alter ego or successor, the amended complaint alleges the existence of "widespread R&W breaches in the SASC 2007-BC2 Trust" (id. at 38—64). In addition, the complaint alleges that the defendants discovered those breaches—including during the period after the securitization closed—and failed to notify plaintiff. Allegedly, and among other things:
• "EquiFirst [ ] received detailed information about the performance of the Mortgage Loans from its 'sister' company HomEq Servicing Corporation ("HomEq"), which serviced and monitored the Mortgage Loans," (id. at 4);
• "There were several stages at which EquiFirst would have performed 'due diligence' on the [loan] files," including not only during origination, but also during "post-closing quality control reviews and audits," an ongoing process whose "finding . . . [we]re [*5]tracked monthly," (id. at 68);
• Per the Prospectus Supplement, EquiFirst "conduct[ed] a number of quality control procedures, including a post-funding audit" of mortgage loans, (id. at 70);
• After Barclays purchased EquiFirst, the vertical integration of their operations allowed the use of a "Proprietary Feedback Structure," where the SASC Defendants "engaged in '[m]onthly monitoring of trends in delinquency, repurchases and due diligence kicks for trends relating to poor performance," a process that "would have provided EquiFirst (and Barclays) with knowledge of loan-level breaches of EquiFirst's representations and warranties," (id. at 72—73); and
• "In performing underwriting reviews, post-funding audits, re-underwriting reviews described to potential investors in great detail in the ProSupp, as well as the post-securitization monitoring of loan performance by EquiFirst and its close affiliates, it is reasonable to infer that EquiFirst discovered . . . breaching Mortgage Loans," (id. at 74).
In other words, the gravamen of plaintiff's amended complaint is that defendants were motivated to hide their discovery of R&W breaches and did not once notify the trustee of a single breach, despite the numerous R&W breaches defendants were able to identify in their own review of the mortgage loans, which occurred following the closing of the securitization. Plaintiff argues further that discovery is needed to determine precisely what defendants knew and when.

LEGAL STANDARD
On a motion to dismiss pursuant to CPLR 3211, "the pleading is to be afforded a liberal construction" and the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v. Martinez, 84 NY2d 83, 87-88 [1994]). However, though well-pled facts are presumed true, "bare legal conclusions and factual claims, which are either inherently incredible or flatly contradicted by documentary evidence...are not presumed to be true on a motion to dismiss for legal insufficiency" (JFK Holding Co., LLC v. City of New York, 68 AD3d 477, 477 [1st Dep't 2009]; see also Robinson v. Robinson, 303 AD2d 234, 235 [1st Dep't 2003] ("[O]n a ... motion to dismiss, the court is not required to accept legal conclusions that are unsupportable based upon the undisputed facts."). On a motion to dismiss based on documentary evidence under CPLR 3211(a)(1), "[i]f documentary proof submitted in support of the motion disproves a material allegation of the complaint, a determination in the defendant's favor is warranted" (see Snyder v. Voris, Martini & Moore, LLC, 52 AD3d 811, 812 [2d Dep't 2008]).

 DISCUSSION
Defendants argue that plaintiff's FTN claims fail for two separate reasons. Principally, defendants contend that plaintiff's FTN claims are untimely. To make this argument, defendants rely on this court's aforementioned Bellwether decision. Defendants read the Bellwether opinion as identifying a "narrow time period" in which an actionable FTN claim can arise: the overlapping period between the statutory limitations period immediately preceding the assertion of an FTN claim and the statutory limitations period following the date the securitization closed. The Bellwether decision left open the question of which standard of discovery the court must apply: "inquiry notice" or "actual knowledge." According to defendants, plaintiff's FTN claim fails regardless of which standard the court chooses to apply.
According to defendants, under an "inquiry notice" standard, plaintiff's claims are time-[*6]barred because defendants were on notice of all potential breaches before the relevant periods for asserting timely FTN claims. Defendants argue that plaintiff's allegations can only support an inference, if any, that defendants were aware of pervasive breaches before the securitizations closed due to their roles as originators or sponsors. Plaintiffs' FTN claims are therefore untimely because defendants are alleged to have been on notice of all potential breaches more than six years before plaintiff brought its claims.
Defendants argue further that under "actual knowledge" standard, plaintiffs' FTN claims also are time barred because plaintiffs' sparse and conclusory allegations are insufficient to plead that defendant actually discovered alleged breaches during the relevant periods for asserting FTN claims. Here, the relevant periods post-date the closings by many months. Plaintiff, however, allegedly provide no plausible basis to infer that defendants—which had no ongoing responsibilities to service or to conduct due diligence on the loans—would have first discovered breaches so long after the underlying deals closed.
Defendants also argue that plaintiff's FTN claims fail for an independent reason. Specifically, according to defendants, plaintiff cannot plausibly allege that EquiFirst's failure to provide notice was the proximate cause of its damages. The record in this action, according to defendants, reflects that U.S. Bank was on notice of its R&W claims during the limitations period, but failed to assert those claims. Therefore, defendants contend that plaintiff's failure to act more quickly was the actual proximate cause of its damages—not as a result of defendants' failure to send written notices of its alleged breaches.
Finally, with respect to Barclays alone, defendants argue that plaintiff's alter ego allegations must be dismissed for failure to satisfy North Carolina's stringent "instrumentality" test for piercing the corporate veil. According to defendants, plaintiff does not come close to meeting its high burden of pleading that Barclays exerted complete domination over EquiFirst, let alone that Barclays used that domination to commit fraud or other wrongful conduct that proximately caused plaintiff's alleged injuries. On the contrary, defendants argue, Barclays did not even acquire EquiFirst until after the close of the SASC securitization, and, therefore, cannot be held liable as EquiFirst's alter ego.
This court will now consider each of these arguments separately.
1. Are plaintiff's FTN claims timely under an "inquiry notice" or "actual knowledge" discovery standard?
In this court's view, the amended complaint sufficiently pleads that plaintiff's FTN claims accrued during the six-year lookback period. Therefore, whether considered under an "inquiry notice" or "actual knowledge" standard, plaintiff's claims are timely.
Both parties agree that New York's six-year statute of limitations applies to plaintiff's FTN claims. Accordingly, the claims are timely if defendants discovered R&W breaches and then failed to provide "prompt written notice" at any point during the six-year lookback period before the filing of the complaint, a period that runs from October 28, 2007 to October 28, 2013. The parties also agree that the "repurchase remedy period"—during which the full scope of damages is available—runs from October 28, 2007 (the beginning of the six-year lookback period) to February 28, 2013 (the sixth anniversary of the securitization). From February 29, 2013 until October 28, 2013, damages recoverable under the "repurchase remedy period" are not available, and plaintiff would be able to recover only nominal damages for breaches discovered during this period.
"[G]iving the Trustee the benefit of all favorable inferences, as the court must do on a [*7]motion to dismiss," Bellwether decision, 59 Misc 3d at 782 (citing 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 NY2d 144, 152 [2002]), the SASC amended complaint sufficiently pleads that FTN claims accrued during the lookback period. The complaint alleges, among other things, that after Barclays purchased EquiFirst—a transaction that was contemplated before, but completed after the SASC securitization closed on February 28, 2007—the SASC defendants began using a "Proprietary Feedback Structure" involving "[m]onthly monitoring of trends in delinquency, repurchases and due diligence kicks for trends related to poor performance," a process that "would have provided EquiFirst (and Barclays) with knowledge of loan-level breaches of EquiFirst's representations and warranties" (complaint at 72—73). The SASC complaint further alleges that "in performing underwriting reviews, post-funding audits, re-underwriting reviews described to potential investors in great detail in the ProSupp, as well as the post-securitization monitoring of loan performance by EquiFirst and its close affiliates, . . . EquiFirst discovered . . . breaching Mortgage Loans" (id. at 74; see also id. at 4, 68 [alleging EquiFirst learned of R&W breaches from "post-closing quality control reviews and audits" and loan performance data obtained from its servicer-affiliate, HomEq, which Barclays purchased]). These allegations are not conclusory; to the contrary, they plead facts—even point to a business presentation and an SEC filing—describing how and when the SASC defendants are alleged to have discovered R&W breaches (see, e.g., Godfrey v. Spano, 13 NY3d 358, 373 [2009] ["conclusory allegations," by contrast, are "claims consisting of bare legal conclusions with no factual specificity"]). Based on these allegations, and regardless of which discovery standard is ultimately applied, it would be possible, if proven, for a trier of fact to conclude, based on the allegations above, that defendants discovered and failed to notify plaintiff of the pervasive R&W breaches in the period between October 28, 2007 and October 28, 2013.
Defendants suggest that it is "implausible" to assert that EquiFirst "waited eight months" to conduct quality control reviews or other audits of mortgage loans in the trust." Here, the implication is that since the securitization closed on February 28, 2007, it is farfetched to assert that EquiFirst (and/or Barclays) had not conducted quality control tests before October 28, 2007 (when the limitation period begun to run). But, as already discussed, "[i]n the context of a motion to dismiss . . . the court must afford the pleadings a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference," and "[w]hether a plaintiff can ultimately establish its allegations is not part of the calculus" (EBC I, Inc. v. Goldman, Sachs & Co, 5 NY3d 11, 19 [2005]). As Justice Friedman recognized in the Bellwether decision, the "question whether [and exactly when] [defendants] discovered breaches of representations and warranties post-securitization is likely a matter peculiarly within [defendants'] knowledge, and is not properly determined on a motion to dismiss," 59 Misc 3d at 782; see also id. at 779—81.). Here too, the amended complaint explicitly alleges that Barclays engaged in numerous quality control processes and reviews after it acquired EquiFirst in April of 2007, and it is plausible, at the motion to dismiss stage, to conclude that not all of the control tests that discovered all of the R&W breaches were run prior to late October of 2007.
Defendants also contend that because the complaint also includes allegations regarding their knowledge of R&W breaches before the closing of the securitization, dismissal is warranted if an "inquiry notice" standard applies. The court is not persuaded by this argument. Defendants have not presented any argument as to whether an actual or inquiry notice standard should apply here (which makes sense, since the Bellwether decision explicitly stated that an Article 31 disclosure would be needed to decide this issue), nor have they addressed the scope of [*8]their investigative duties should an inquiry standard apply. As recognized in the Bellwether decision, fact discovery is needed to determine which standard applies and what the contours of "discovery" are in either case (Bellwether decision, 59 Misc 3d at 776, 781-782). Regardless of which discovery standard ultimately is applied herein, allegations that defendants knew of some breaches prior to the securitization are not equivalent to allegations that they knew about all of them, particularly given that the amended complaint expressly pleads numerous post-securitization discovery of breaching loans.
Accordingly, allegations regarding defendants' pre-closing knowledge do not permit dismissal, and this court is satisfied that the SASC 2007-BC2 complaint pleads timely failure-to-notify claims.
2. Does the complaint sufficiently plead proximate causation?
Defendants separately argue that plaintiff cannot plausibly allege that Equifirst's failure to provide notice was the proximate cause of its damages. This is because, according to defendants, U.S. Bank was on notice of its R&W claims during the limitations period, but failed to assert those claims. In fact, U.S. Bank, defendants assert, took other steps demonstrating its awareness of its R&W claims, including, in 2009, filing proofs of claims in the Lehman Brothers bankruptcy on behalf of the SASC 2007-BC2 securitization for damages based on breaches of representations and warranties. U.S. Bank, defendants argue, therefore cannot plausibly now claim that Equifirst's failure to notify it of breaches caused U.S. Bank to fail to file suit within the limitations period. U.S. Bank, according to defendants, simply chose not to assert R&W claims of which it was aware—and such failure to act promptly is the actual proximate cause of its damages.
"It is apparent from the plain terms of the [governing agreements] that the duty to notify serves primarily to facilitate the Trustee's pursuit of the repurchase remedy for breaches of representations and warranties" (Bellwether decision, 59 Misc 3d at 785). Here, the amended complaint alleges that defendants were aware of R&W breaches long before the trustee (complaint at 78), and accordingly it is reasonable to infer that, had defendants notified the trustee, the trustee would have sought the repurchase while that remedy was still available.
Defendants nonetheless contend that the trustee "was on notice of its potential R&W claims within the applicable limitations period, but simply failed to bring suit," pointing to (i) U.S. Bank's filing of proofs of claim in the Lehman Brothers bankruptcy proceeding, (ii) U.S. Bank's commencement of actions in connection with other RMBS trusts before the statute of limitations expired for this trust, and (iii) the filing of a timely summons by FHFA, which purportedly knew less than U.S. Bank. None of these points avail defendants. First, defendants incorrectly assume that the trustee's proofs of claim for loans with misrepresentations (addressing only three of 3,800 loans in the SASC 2007-BC2 securitization) and missing documents all involved EquiFirst loans. In fact, the proofs of claim relating to loans with misrepresentations each appear to have involved trust loans originated by Aurora Bank and hence they have no bearing on the trustee's knowledge of breaches of EquiFirst's R&Ws. Second, the trustee's knowledge of R&W breaches in other RMBS securitizations (none of which involved EquiFirst or Barclays) similarly has no bearing on causation here. Third, defendants' contention that the trustee, with its limited duties, "knew more" than certificateholders who invested in the securitization and were incentivized to monitor its performance is not a basis for dismissal. As Justice Friedman determined in the Bellwether decision, where the defendants raised similar arguments, "causation must ultimately be [*9]determined by the fact finder upon a fully developed record" (Bellwether decision, 59 Misc 3d at 788 (citing NAF Holdings, LLC v. Li & Fung (Trading) Ltd., 2016 WL 3098842, at *6 [SDNY June 1, 2016]); see also Mirand v. City of New York, 84 NY2d 44, 51 [1994] ["Proximate cause is a question of fact . . . where varying inferences are possible."]).
Accordingly, this court is satisfied that the amended complaint sufficiently pleads proximate causation.
3. Does the complaint sufficiently allege Barclays' alter-ego liability?
In this court's view, plaintiff has failed to demonstrate that Barclays was EquiFirst's alter ego.
It is undisputed that plaintiff's alter ego claim is governed by North Carolina law because EquiFirst was created in that jurisdiction (see Klein v. CAVI Acquisition, Inc., 57 AD3d 376, 377 [1st Dep't 2008]). "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries" (United States v. Bestfoods, 524 US 51, 61 [1998]). North Carolina, like New York, adheres to this "general principle" (see Dep't of Transp. v. Airlie Park, Inc., 576 SE2d 341, 344 [NC App 2003] ["A corporation is treated as an entity separate from its stockholder or stockholders under all ordinary circumstances"]). Accordingly, piercing the corporate veil is rare. It is a "drastic remedy" that "should be invoked only in an extreme case where necessary to serve the ends of justice" (Best Cartage, Inc. v. Stonewall Packaging, LLC, 727 SE2d 291, 300 [NC App 2012]).
North Carolina courts apply the "instrumentality" test, under which a corporate veil may be pierced only where (i) there is sufficient control, meaning "complete domination, not only of finances, but of policy and business practice"; (ii) such control was used "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act"; and (iii) such control and injustice proximately caused the asserted injury (id. at 330). New York applies the same elements (see E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc., 16 NY3d 775, 776 [2011]). A complaint relying on allegations that fail to satisfy this demanding test will be dismissed. Thus, in Best Cartage, where the plaintiff claimed that one defendant "created and used" another defendant (a North Carolina LLC) "merely as a shell to insulate itself from any potential claims brought by outside creditors," the North Carolina appellate court concluded that the plaintiff failed to make "sufficient allegations to maintain this claim" (id.).
Here, plaintiff's alter-ego allegations against Barclays fail. U.S. Bank concedes that Barclays played no role in the origination or sale of the EquiFirst loans or the SASC securitization, was not a party to any of the relevant agreements, and did not even acquire EquiFirst until after all of the relevant agreements had been executed (amended complaint at 94). Nevertheless, the plaintiff alleges that Barclays is liable for EquiFirst's alleged breaches because it is EquiFirst's "alter ego." Plaintiff, however, relies on alleged conduct that is neither indicative of an improper relationship nor abusive of the corporate form. Indeed, plaintiff's allegations do not come close to meeting its heavy burden. With respect to control, it alleges only that Barclays (i) provided funding to EquiFirst, (ii) terminated some EquiFirst employees following the acquisition, and (iii) ultimately terminated EquiFirst's lending operations and placed it into dissolution (id. at 95, 97-99). Such conduct, even if true, describes only ordinary incidents of corporate ownership, and cannot serve as the basis for alter ego liability (Bestfoods, 524 US at 61—62 ("[I]t is hornbook law that 'the exercise of the "control" which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary"]).
Plaintiff's argument that Barclays became EquiFirst's alter ego following the SASC securitization fares no better. In support of its assertion that Barclays completely dominated and controlled EquiFirst post-closing, plaintiff alleges that Barclays purchased EquiFirst with knowledge of its liabilities for a reduced price, transferred some of its assets and personnel, and decreased some of its capital. But it never alleges how these relatively common steps in the purchasing process connect Barclays to EquiFirst's alleged failure to notify U.S. Bank, as trustee, of any supposed breaches of representations and warranties (id. at 71-72 (actions "consistent with the parent's investor status . . . should not give rise to direct liability"). Therefore, this court is not persuaded by plaintiff's argument that Barclays can be held liable for EquiFirst's alleged breaches as its alter-ego.
However, that does not mean that Barclays is dismissed from this action. Neither EquiFirst nor Barclays challenge the complaint's allegations of successor liability (amended complaint at 96, 101 where it is alleged that "By virtue of the foregoing alleged conduct, including its acquisition of 100% of EquiFirst's common equity, its dissolution of EquiFirst and its integration of EquiFirst's operations into its own, Barclays is liable to the Trustee as successor to the liabilities of EquiFirst"). This is an independent reason why Barclays cannot, at this juncture, be dismissed as a defendant, even though plaintiff has failed to demonstrate that Barclays can be held liable as EquiFirst's alter-ego.
Accordingly, it is
ORDERED that defendants' motion to dismiss is denied insofar as defendants seek dismissal on the basis that plaintiff's FTN claims are untimely; and it is further
ORDERED that defendants' motion to dismiss is denied insofar as defendants seek dismissal on the basis that plaintiff failed to allege proximate causation; and it is further
ORDERED that defendants' motion to dismiss is granted in part to the extent that defendants seek to dismiss alter-ego allegations as asserted against Barclays; and it is further
ORDERED that Barclays is nonetheless not dismissed from this action at this juncture due to its failure to challenge plaintiff's successor liability arguments.
Dated: October 27, 2023
Robert R. Reed, J.S.C.